RECEIVED

USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK

DATE **6 / 26 / 14**

*JJB*

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

STANLEY WAYNE DAUZAT,
    Appellant

CIVIL ACTION
NO. 1:13-cv-00953

VERSUS

U.S. COMMISSIONER OF SOCIAL
SECURITY,
    Appellee

JUDGE JAMES T. TRIMBLE
MAGISTRATE JUDGE JAMES D. KIRK

<u>REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE</u>

    Stanley Wayne Dauzat ("Dauzat") filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on November 5, 2010, when he was 41 years old, alleging a disability onset date of September 15, 2009 (Tr. pp. 208, 212) due to degenerative joint disease, depression, anxiety, and bipolar disorder (Tr. p. 157). Those applications were denied by the Social Security Administration ("SSA") (Tr. pp. 132, 136).

    A de novo hearing was held before an administrative law judge ("ALJ") on August 17, 2011, at which Dauzat appeared with his attorney, a vocational expert ("VE"), and a medical expert ("ME") (Tr. p. 30). The ALJ found that Dauzat suffers from severe impairments of anxiety, mood disorder and psychotic disorder exacerbated by substance abuse and alcohol abuse, personality disorder, and is status post anterior cruciate ligament tear and medial meniscus tear in the right knee (Tr. p. 15). The ALJ also found that Dauzat's impairments in combination with his substance

abuse disorder meet or equal Listing 12.09 (by reference to Listing 12.04) of 20 C.F.R. Part 404, Subpart P, Appendix I.   The ALJ further found that, without his substance abuse disorder, Dauzat does not meet a listing in Appendix I and has the residual functional capacity to perform sedentary work with additional limitations of being able to understand, remember and carry out short, simple work-related instructions that are not involved (meaning not complex or detailed), he is able to respond appropriately to supervisors and co-workers, and he is able to make only short, simple work-related decisions (Tr. p. 18).   The ALJ concluded that Dauzat cannot do his past relevant work as a scrap worker, construction worker, or tire changer, but he can work as an addresser (Tr. p. 24) and, therefore, was not under a disability as defined by the Social Security Act at any time through the date of his decision on March 9, 2012 (Tr. p. 25).

Dauzat requested a review of the ALJ's decision, but the Appeals Council declined to review it and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Dauzat then filed this appeal for judicial review of the Commissioner's final decision (Doc. 12).   Dauzat raises the following issues on appeal:

1. The ALJ erred in refusing to apply EM 96-200 and in misapplying the DAA rules.

2. The ALJ's credibility assessment was improper.

3. The ALJ did not comply with 20 C.F.R. § 404.1527 in weighing the evidence.

2

> 4. Competent evidence does not support the ALJ's reliance
> on the vocational expert's testimony.

The Commissioner filed a brief in response to Dauzat's appeal (Doc. 13).  Dauzat's appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a).  Eligibility is dependent upon disability, income, and other financial resources.  42 U.S.C. 1382(a).  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C. 416(I), 423.  Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment

that exists in the national economy.   42 U.S.C. 423(d)(2).

Summary of Pertinent Facts

At the time of his August 17, 2011 administrative hearing, Dauzat was 41 years old, had a sixth grade education (Tr. p. 36) and past relevant work as a recycler in a pawn shop (2003-2009) (Tr. p. 258) and doing "various" jobs (1995-2003) (Tr. p. 248).

1. Medical Records

Dauzat was hit in the side of his right knee in August 2008; three months later he had crepitus and mild effusion, was diagnosed with bursitis and arthritis, and was given an injection in his right knee and prescribed Mobic and Ultram (Tr. p. 496).

In February and June 2009, Dauzat was seen for complaints of headaches, dizziness, insomnia, and fatigue; he reported increased stress and anxiety (Tr. p. 496).   Dauzat was prescribed Xanax and Celexa (Tr. p. 496).

In February 2010, Dauzat was evaluated in the LSU Health Sciences Center for chronic right knee pain and prescribed Mobic (Tr. pp. 451-460).   Dauzat returned in April 2010 for right knee pain and was prescribed Medrol and Percocet (Tr. pp. 452-455).   X-rays taken in February and April of 2010 showed well-maintained joint spaces and no evidence of fractures of dislocations (Tr. pp. 492-493).

In May 2010, Dauzat complained of chronic right knee pain, explaining that his knee had popped out of the socket and was swollen; he was prescribed Motrin (Tr. pp. 446-450).   In June 2010, Dauzat complained of right knee pain which had worsened over the

last six months (Tr. p. 445).  X-rays were ordered (Tr. p. 445), and he was given physical therapy (Tr. pp. 441-444).  An MRI of his right knee showed an ACL tear, a complex tear of the medial meniscus, a small joint effusion, a Grade 1 injury of the medial collateral ligament, and minimal prepatellar bursitis (Tr. pp. 490-491).

In July 2010, Dauzat was evaluated at the Avoyelles Mental Health Unit (Tr. p. 323).  Dauzat was 40 years old, had been married 22 years and had one child (18 years old), had a sixth grade education, and had been unemployed for the last year; his wife was employed at a daycare (Tr. pp. 323, 325-326).  Dauzat complained of anxiety and depression for the last fifteen years, including anxiety attacks and shortness of breath, and his wife stated that he has social anxiety and does not like to be around people (Tr. p. 323, 325).  Dauzat reported that drinking helps some, and that he has been in rehab twice (Tr. pp. 323, 330).  Dauzat also reported that he hears voices that he cannot understand almost daily, sees "things" two to three times per week, sometimes thinks people are "out to hurt him," has mood swings, has gotten into fights, his sleep is poor, he feels suicidal sometimes, and he has some difficulty with hygiene (bathing only two or three times per week) (Tr. p. 325).  Dauzat stated that he drinks about a case of beer daily and had done so for several years, he trembles when he awakens, he has black outs, he has had three DUI's, and he does not drive (his wife drives)(Tr. pp. 326-327, 329).  Dauzat reported that he had previously been prescribed Celexa and Xanax, but he was

only taking Celexa because he could not afford the Xanax (Tr. p. 326). Dauzat also reported that he had sometimes taken more Xanax than prescribed to handle anxiety, and had sometimes taken four Tylenol PM (although the recommended dose is two) to help him sleep (Tr. p. 326). Dauzat reported that he is in financial straits (Tr. p. 327) and had quit working at the pawn shop in August 2009 because the job became too stressful (Tr. p. 329). Dr. Lalitha Alla, a psychiatrist, diagnosed mood and anxiety disorders with alcohol abuse and dependence at Axis I, and assigned a GAF of 65[1] (Tr. p. 324). Dauzat was prescribed outpatient substance abuse treatment (Tr. p. 331), Celexa, and Visteril (Tr. p. 324).

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. DSM-IV-TR at 32-34. The GAF scale goes from 0-100: a score of 61-70 indicates some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR, at 34. Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

In June 2010, a pulmonary function study showed that Dauzat has mild obstructive airways disease (Tr. pp. 485-486).   Dauzat admitted he had smoked two packs of cigarettes per day for 25 years (Tr. p. 485).   X-rays of Dauzat's chest and abdomen were normal (Tr. pp. 488-489).

In July 2010, Dauzat complained of a right knee ACL tear for several months and dislocation of his knee joint on a regular basis; he was given a knee immobilizer that he did not wear because it was too big (Tr. p. 415).   Dauzat's knee became mildly swollen and tender after an altercation (Tr. p. 415), and he was prescribed Indomethacin and Darvocet and referred to the Orthopedic Clinic at the LSU Health Sciences Center (Tr. p. 416).   X-rays showed there was no fracture or dislocation (Tr. pp. 482-483).   Later in July 2010, Dauzat was prescribed Percocet and Mobic, and surgery was scheduled for September 2010 (Tr. pp. 422).

In August 2010, Dauzat's response regarding mental health progress toward his treatment goals was guarded and he was prescribed Hydroxyzine, Celexa, and Vistaril, and tests were ordered (Tr. p. 322).   Dauzat's medications were refilled in September and November 2010 (Tr. p. 321) and, in November, Dauzat's response about his progress was fair (Tr. p. 322).

In September 2010, Dauzat underwent a surgical repair of a torn anterior cruciate ligament ("ACL") in his right knee (Tr. pp. 310-312; 408-409).   There was also an un-repairable "medical meniscal tear bucket-handle" of his right knee (Tr. p. 311). Dauzat was given exercises to do post-surgery (Tr. pp. 403-407).

7

X-rays in October 2010 showed the ACL repair, and an apparent suprapatellar bursa effusion and joint effusion with no definite acute fracture (Tr. p. 314), as well as quad atrophy (Tr. p. 393). Dauzat underwent physical therapy in November and December 2010 (Tr. pp. 388-391).

In December 2010, Dauzat was treated for increasing right knee pain in the orthopedic clinic at LSU-Huey P. Long Medical Center (Tr. p. 382). Dauzat's knee was a little warm with mild to moderate effusion, but there was a full range of motion and his ACL appeared to be stable (Tr. p. 387). Dauzat was advised to engage in moderate activity, to continue his hamstring strengthening exercises, and to take Aleve (Tr. p. 387). In January 2011, Dauzat complained of pain radiating from his right knee up and down his leg (Tr. p. 375). Dauzat's right knee was swollen and he walked with crutches (Tr. p. 375). Dauzat was given a Toradol injection (Tr. p. 379).

Also in January 2011, Dauzat was evaluated by a Dr. Omar Saleem, a Missouri physician (Tr. pp. 333-336). Dauzat reported that he has degenerative joint disease, depression, anxiety, bipolar disorder, and tendonitis in both elbows (Tr. p. 333). Dauzat's tendonitis is worse in his left elbow than his right, and his symptoms improve significantly with rest (Tr. p. 333). Dauzat also reported that, since his right knee surgery, he has had significant pain, swelling and discomfort with prolonged ambulation that is relieved with rest and anti-inflammatories; he also uses a straight cane to walk (Tr. p. 333). Dauzat reported that he is

8

unable to do any chores (Tr. p. 333). Dauzat admitted that he uses tobacco but denied using alcohol (Tr. p. 334). Dauzat's gait and station were normal, he could tiptoe, heel walk and squat normally, his affect was flat, he appeared sad and withdrawn, he had a full range of motion in the elbows bilaterally, his grip and upper extremity strength were both 5/5 bilaterally, his right knee was swollen with slight effusion but no tenderness, he had 4/5 strength on right knee extension (5/5 on the left) but a full range of motion, no patellar instability, and no muscle atrophy (Tr. pp. 335-336). Dr. Saleem found that Dauzat should be able to sit and stand, pull and push, kneel, crawl and crouch, reach, grasp, handle and finger objects, and did not need an assistive device (cane) (Tr. p. 336).

Dauzat was evaluated by Fay C. Thrasher, Ph.D., a clinical psychologist, in February 2011 (Tr. p. 341). Dauzat reported anxiety attacks at least three times a week, mood swings, depression, anger, degenerative joint disease, torn cartilage in his knee, and social anxiety (Tr. p. 341). Dauzat also reported taking Celexa and Vistaril, and admitted alcohol abuse, drinking three to six beers per day (Tr. p. 341); Dr. Thrasher noted Dauzat's prior records showed him drinking a case of beer per day, taking excessive amounts of Xanax while consuming alcohol, and having been in two treatment programs (Tr. p. 341). Dauzat reported that he can bathe and groom, his wife helps him dress, knee pain limits his ability to stand, sit and walk, he does not shop due to social anxiety, and he does not cook or do chores (Tr.

p.342).  Dauzat stated that he arises between 5:00 and 8:00 a.m., listens to the radio, watches TV and stays home, eats two meals per day, goes to bed between 9:00 and 10:00 p.m., isolates himself, and does not like to be around people (Tr. p. 342).  Dauzat stated that he has auditory hallucinations but denied having delusions (Tr. p. 342).

Dr. Thrasher found that Dauzat appeared to be depressed (Tr. p. 343).  Dauzat's general fund of knowledge appeared to be poor, his remote memory was fair, his recent memory was poor, his comprehension was fair, his estimated intellectual functioning was within the low average range, his concentration, persistence and pace were fair, he could preform repetitive skills and a three-stage command, his judgment was good, and his insight was fair (Tr. p. 343).  Dr. Thrasher diagnosed alcohol dependence, bipolar II disorder (by history), depressive disorder NOS, anxiety disorder NOS, and substance abuse (Xanax)(by history) at Axis III, psychosocial stressors of unemployment, physical problems, a history of substance abuse, financial problems, and interpersonal problems at severity level 4 (severe) at Axis IV, and a GAF of 60 at Axis V (Tr. p. 343).  Dr. Thrasher's prognosis was guarded, and she stated that Dauzat appeared to be able to understand, retain and follow instructions, appeared to be able to perform detailed, complex work tasks, should be able to maintain the attention and concentration needed to perform simple work tasks for a two-hour time block, his ability to respond appropriately to supervision and interact appropriately with co-workers was uncertain due to his

interpersonal problems, his ability to sustain effort and persist
at a normal pace over the course of a routine forty-hour work week
was uncertain due to his physical problems, depression, anxiety and
history of substance abuse, and his ability to tolerate the stress,
pressure, and social environment of a work setting appeared to be
questionable due to his anxiety, depression, and history of
substance abuse (Tr. p. 344).  Dr. Thrasher stated that Dauzat
appears to be capable of managing his money, although his wife
manages the money because he spends it too fast (Tr. p. 344).

X-rays of Dauzat's right knee in January 2011 showed his
previous ACL repair and a small joint effusion (Tr. p. 477).  An
MRI in February 2011 showed that Dauzat's ACL graft repair was in
tact, but he had a tiny joint effusion, diffuse, ill-defined edema,
and minimal narrowing of the joint (Tr. p. 476).

In March 2011, Dauzat went to the emergency room for bilateral
knee pain (Tr. pp. 368-373).  Dauzat had mild effusion in the right
knee but his joint was stable, and he was prescribed a Medrol dose
pack and Naprosyn (Tr. pp. 371-372).  Dauzat returned later in the
month for evaluation of his right knee and elbow pain (Tr. p. 367).
Dauzat was diagnosed with a bone contusion and tennis elbow, and
was prescribed physical therapy for his knee and given an injection
for his elbow (Tr. p. 367).

In May 2011, Dauzat went to the medical clinic for anxiety,
insomnia, and pain in his knee and elbows; he reported that he had
stopped drinking a month and a half ago (Tr. p. 359).  Dauzat was
prescribed Zantac, Meloxicam, Celexa, and Ambien, and advised of

11

the consequences of starting alcohol again (Tr. p. 359).

Dauzat underwent physical therapy for his right knee in March through June 2011, but was referred back to the orthopedic physician for further assessment due to his continued complaints of pain and swelling (Tr. pp. 353-358). Later in June 2011, Dauzat was seen for right knee pain at the LSU-Huey P. Long Medical Center, on referral from the physical therapist (Tr. p. 351), and was given a steroid injection (Tr. p. 351).

In September 2011, clinical psychologist Tommy T. Stigall, Ph.D., reviewed Dauzat's medical records and filled out a mental health questionnaire on Dauzat (Tr. pp. 501, 525). Dr. Stigall found that Dauzat suffers from alcohol dependence, bipolar II disorder, depressive disorder NOS, and anxiety disorder NOS, has a history of substance abuse (Xanax), and has a GAF of 60 (upper limits of moderate impairment) (Tr. p. 531). Dr. Stigall found that Dauzat has functional limitations, assuming abstinence and sobriety, of moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (Tr. pp. 531-532). Dr. Stigall stated that, assuming abstinence, sobriety, and compliance with treatment, Dauzat does not meet Listings 12.04, 12.06 or 12.09 (Tr. p. 532). Dr. Stigall reasoned that Dauzat's symptoms of depression and anxiety are significantly related to his history of substance abuse (Tr. p. 532), and would be expected to improve significantly with abstinence, sobriety and compliance with appropriate mental health

12

treatment (Tr. p. 533).  Dr. Stigall further found that Dauzat has not had related episodes of decompensation of extended duration, and he is able to function without the necessity of psychiatric hospitalization, extended care or assisted living (Tr. p. 533). Dr. Stigall concluded that, assuming abstinence, sobriety and treatment compliance, Dauzat should be able to perform sedentary or light work on a sustained basis, especially if his duties do not include frequent or extended contact with the general public, and that his ability to sustain effort and persist at a normal pace over a routine forty-hour work week should improve with abstinence and treatment compliance (Tr. p. 533).

### 2. August 2011 Administrative Hearing

At his August 17, 2011 administrative hearing, Dauzat testified that he was born in September 1969 (he was 42 years old), he completed the sixth grade in school and did not earn a GED, and he can read and write very little; Dauzat testified that he cannot write a grocery list, cannot read a newspaper article, cannot read the names of streets on signs, and cannot write his street address, but can read his address on his mail (Tr. pp. 36-37).  Dauzat testified that he cannot fill out a job application by himself (Tr. p. 71).  Dauzat testified that he is married, has one child (19 years old), and his wife provides their only income by working as a sitter for the elderly (Tr. pp. 37-38).  Dauzat testified that they live in a mobile home that they own, but they rent the lot (Tr. p. 38).  Dauzat testified that he is about 5'7" tall and weighs 155 pounds (Tr. p. 39).

Dauzat testified that he became disabled on September 15, 2009 due to his depression, anxiety, bipolar disorder, and right knee problems (Tr. pp. 39-40).

Dauzat testified that he last worked as a recycler, purchasing aluminum, copper, brass and other metals for the company he worked for (Tr. p. 40). Dauzat testified that, when people sold their metal, he would weigh it and write down the weight, and the company would pay for the metal, then he would have to put the metal into a machine that crushed it into blocks (Tr. pp. 40-41). Dauzat testified that he would spend about eight hours per day on his feet, but was able to sit down now and then if there were no customers (Tr. pp. 40-41). Dauzat worked there for about six years (2003-2009) (Tr. p. 42). Dauzat testified that the heaviest weight he had to pick up was about 100 pounds, during pecan season (Tr. p. 41).

Dauzat testified that, prior to working as a recycler, he worked as a carpenter's helper for a total of about two years in the last fifteen years (Tr. pp. 42-43). Dauzat testified that, as a carpenter's helper, he was on his feet about half of the day, sat for about half the day, and would lift and carry about forty pounds (Tr. pp. 43-44). Dauzat testified that he worked as an auto mechanic for a total of about ten years in the last fifteen years (the longest period was for about three or four years at the same place) (Tr. p. 44). Dauzat testified that, as an auto mechanic, he was on his feet most of the day, lifting more than fifty pounds sometimes, he had to get on his knees often, and he had to roll

14

around on the ground some (Tr. pp. 45-46).  Dauzat testified that
he has not worked at all since September 2009 (Tr. p. 46).

Dauzat testified that he started having problems with his knee
in 2005, when his nephew kicked him (Tr. p. 47).  Dauzat testified
that, after he injured his knee, he would see a doctor whenever his
knee popped out of socket; the doctor would take x-rays, wrap his
knee in an ace bandage, and prescribe Mobic (Tr. pp. 55-56).

Dauzat testified that he had surgery on his knee in 2010, to
replace the ACL (Tr. pp. 47-48).  Dauzat testified that his knee
has felt worse since the surgery; it does not fall out of the
socket (dislocate) any more, but it swells and is very painful (Tr.
p. 48).  Dauzat testified that his doctor said the cartilage in his
knee is "messed up" (Tr. p. 48).  Dauzat testified that he used
crutches for two or three weeks immediately after his surgery, then
he started going to physical therapy (Tr. pp. 48-49).  Dauzat
testified that he had physical therapy for about a month, but it
made his knee worse so the therapist had Dauzat return to his
surgeon (Tr. p. 53).  The surgeon told Dauzat to continue to do
what he could in physical therapy (Tr. p. 53).  Dauzat testified
that the physical therapist wanted him to walk without crutches to
strengthen his leg, so he just used a cane, and still uses a cane
sometimes (Tr. p. 49).

Dauzat testified that he also has tendonitis in his elbows,
which makes is difficult to use a cane (Tr. p. 49).  Dauzat
testified that he can walk without his cane, but it is difficult
(Tr. p. 50); the last time he was unable to walk without his cane

was in March 2011 (Tr. p. 50).

Dauzat testified that, in March 2011, when he no longer needed to use the cane to walk, he could walk for five to ten minutes before his knee would throb and hurt (Tr. pp. 50-51). Dauzat testified that he could also stand in one place for about twenty minutes (Tr. p. 51). Dauzat testified that, in March 2011, he had problems sitting because his knee would stiffen up if he sat too long; now, his knee stiffens up in about 30 to 45 minutes (Tr. p. 51). To relieve the stiffness, in March 2011, Dauzat would have to elevate his knee and put an ice pack on it (Tr. p. 51); he spent about six or seven hours a day with his knee elevated and with an ice pack on it (Tr. p. 52). In March 2011, Dauzat could not carry more than twenty pounds (Tr. p. 52).

Dauzat testified that, as of the time of his hearing, in August 2011, he can walk five to ten minutes, stand about twenty minutes, sit 30 to 45 minutes, and lift/carry up to twenty pounds (Tr. p. 52). Dauzat testified that he walks with a cane because his physical therapist recommended it; he uses it at least twenty days per month (Tr. p. 71). Dauzat testified that he has problems using a cane because he has tendonitis in his elbows (Tr. p. 71). Dauzat testified that he would use his cane more if his elbows did not bother him (Tr. p. 72). Dauzat testified that he takes Meloxicam (an anti-inflammatory) and Lortab (for pain), and his doctor recently added Prednisone, Vistaril (for anxiety), Zantac, and Ibuprofen 600 mg (Tr. p. 53). Dauzat testified that he has not started taking the new medications yet because he cannot afford

16

them (Tr. p. 54).  Dauzat testified that Meloxicam does not really help, but Lortab helps (Tr. pp. 54-55).  Dauzat testified that he puts ice packs on his knee every day, as recommended by his doctor (Tr. p. 72).  Dauzat testified that a CTU, or cold therapy unit, is an ice pack that is supposed to reduce swelling, but is also known to cause nerve damage (Tr. p. 73).  Dauzat testified that he used a CTU for about one month, but the swelling in his knee was not reduced and he had sharp, shooting pains on the side of his knee going up into his leg (Tr. pp. 73-74); after he learned the CTU could cause nerve damage, he stopped using it (Tr. pp. 73-74).  Dauzat testified that, when he told his physical therapist about the pain in his leg when he used the CTU, the therapist told him not to use it as much (Tr. p. 75).  Dauzat testified that he still bandages his knee (Tr. p. 74).

Dauzat testified that he thought his mental health problems started about fifteen years ago, and they have worsened over time (Tr. p. 57).  Dauzat testified that he sees Dr. Ali, at Huey P. Long Medical Center, who prescribes Celexa (Tr. p. 57); Dauzat no longer takes Xanax (Tr. pp. 57-58).  Dauzat testified that he used to see a different doctor at the Avoyelles Mental Health who prescribed Vistaril, but he ran out of that (Tr. pp. 58-59).

Dauzat testified that his mental health problems make him feel angry a lot, sad a lot, and he cries (Tr. p. 59).  Dauzat testified that he sleeps about four hours on a good night, then he starts tossing and turning (Tr. pp. 60-61).

Dauzat testified that he has trouble concentrating because he

17

gets distracted (Tr. p. 61). Dauzat testified that he watches television, but his knee pain makes it difficult for him to pay attention to a thirty minute sitcom because he has to move around a lot (Tr. p. 61). Dauzat testified that his memory is not very good; his wife sets his medication out for him every day and gives it to him at night (Tr. pp. 61-62). Dauzat testified that he has anxiety attacks every day; he feels faint and sweats, and the worst ones last a couple hours (Tr. p. 62). Dauzat testified that, after a panic attack ends, he is very tired and has to lie down (Tr. p. 63). Dauzat testified that he has been prescribed Vistaril for anxiety (but has not filled the prescription) (Tr. p. 63). Dauzat testified that his prior Vistaril prescription ran out in April; when he was taking Vistaril, Dauzat had panic attacks three to four times per week (Tr. p. 64).

Dauzat testified that, on a typical day, he usually is home by himself, he sits or lies down with his leg up and watches television, listens to the radio or sleeps (Tr. pp. 64-65). Dauzat testified that he elevates his leg a little above heart level for about half of the time he spends sitting (Tr. p. 72). Dauzat testified that he leaves the house two or three times per week and his wife drives him to his mother's house or his mother-in-law's house; they live about twelve miles away (Tr. p. 65). Dauzat testified that he seldom drives, the longest distance he drives is two miles to the store (Tr. p. 65). Dauzat testified that he does not cook but he can make himself a sandwich, his wife and son clean the house, he does not do anything around the house, and he does

18

not do laundry or grocery shopping (Tr. pp. 66-67).

Dauzat testified that he still drinks about a six-pack of beer a day, he went to an inpatient rehab in March 2011 and is struggling with his drinking problem (Tr. pp. 67-68). Dauzat testified that he had to leave rehab after four days because he twisted his knee walking up and down stairs, so he went to AA meeting for one week (Tr. p. 68). Dauzat testified that, before rehab, he drank a case of beer every day for fifteen years (Tr. pp. 68-69). Dauzat testified that, five or six years ago, he spent two weeks in rehab for alcoholism (Tr. p. 69). Dauzat testified that his mental health care professionals told him his depression and anxiety are caused by his alcoholism, but Dauzat testified that he still had anxiety when he quit drinking, and that his mother and two of his sisters also suffer from anxiety (Tr. pp. 69-70).

Tommy Stigall, a clinical psychologist, testified as a medical expert (Tr. p. 75).[2] Dr. Stigall summarized the mental health evidence in the medical records and testified that the most relevant listings in Appendix I are 12.04, 12.08 and 12.09 (Tr. p. 81). Dr. Stigall testified that, including Dauzat's alcohol abuse and dependence, Dauzat meets Listings 12.04, 12.06 and 12.09 due to his mood disorder and anxiety-related disorders (Tr. p. 82). Dr. Stigall further testified that, if Dauzat were abstinent, sober and

---

[2] Dr. Stigall stated that he only had exhibits 1-9F from the administrative record, and that he did not have exhibit 10F, which consists of medical records from Huey P. Long Hospital (Tr. pp. 91-92). However, the ALJ and Dauzat's counsel agreed that only two records dealt with mental health issues (there are two mentions of drinking in 2011 in those records)(Tr. p. 92).

treatment-compliant, his restrictions of daily living would be mild
to moderate his difficulties in maintaining social functioning
would be moderate, his difficulties in maintaining concentration,
and persistence or pace would be mild to moderate, and there is no
evidence in the record of episodes of decompensation of extended
duration (Tr. p. 82).  Dr. Stigall testified that, at that time,
Dauzat's status was essentially chronic and that it would be
appropriate to assign him a residual functional capacity (Tr. p.
82).

Dr. Stigall further testified that, assuming abstinence, Dauzat
can perform simple, short work-related instructions that are not
involved, complex or detailed, and that he can understand, remember
and carry out work-related instructions that are detailed but not
complex (Tr. p. 83).  Dr. Stigall testified that, assuming sobriety,
Dauzat might have difficulty with more complex instructions (Tr. p.
83).  Dr. Stigall testified that, assuming sobriety and abstinence,
Dauzat should be able to respond appropriately to supervision in a
work environment and be able to interact appropriately with coworkers
(Tr. pp. 84-85).  Dr. Stigall testified that Dauzat would have
difficulty with normal kinds of pressure at work, even if he is
abstinent and sober, but he should be able to make simple work-related
decisions (Tr. p. 85).

Dr. Stigall explained that the issue of substance abuse is
material because it is relevant to the determination of whether Dauzat
is disabled or not (Tr. p. 93).  Dr. Stigall stated that bipolar
disorder or a mood disorder can produce problems responding to work

pressures and problems responding to supervision and interacting with coworkers, and that substance abuse can also produce problems dealing with work pressures, concentration, and socializing with the public (Tr. pp. 94-95).   Dr. Stigall testified that, in a case such as Dauzat's, where the claimant has a combination of bipolar disorder and substance abuse, no one can separate the functionally limiting effects that relate to substance abuse from those relating to the mood disorder (Tr. pp. 95-96).   Dr. Stigall stated that he understood that substance abuse is Dauzat's primary difficulty (Tr. p. 96).

Dauzat testified at his hearing that, when he was working as an auto mechanic, he was changing tires, doing front end alignments, and replacing steering parts in vehicles, but was not working on engines or transmissions (Tr. p. 89).   The VE then testified that Dauzat's past work as a scrap worker was heavy, SVP 2 and DOT 519.686-010, his past work as a construction worker II was heavy, SVP 2 and DOT 869,6887-026, and his past work as a tire changer was heavy, SVP 3, and DOT 915.684-010 (Tr. p. 90).

The ALJ posed a hypothetical question to the VE involving a claimant who can do medium work, can follow, understand, and remember simple, short work-related instructions, and can maintain his attention and concentration sufficiently to perform simple work-related tasks for two-hour blocks at a time, but is unable to respond appropriately to supervisors, coworkers, and work-related pressures (Tr. pp. 98-99).   The VE testified that such a person could not do any of Dauzat's past relevant work (Tr. p. 99).   The VE further testified that such a person also could not do any other work due to his

21

inability to respond to coworkers and supervisors (Tr. p. 99).  The ALJ then admitted he forgot to add the limitation of illiteracy to the hypothetical (Tr. p. 99).

The ALJ posed a second hypothetical involving a person of Dauzat's age and education, who is illiterate, who is limited to sedentary work, who has the ability to understand, remember and carry out short, simple work-related instructions that are not involved, complex or detailed, who can respond appropriately to supervisors and coworkers, and who can make simple work-related decisions (Tr. p. 99). The VE testified that such a person cannot do any of Dauzat's past relevant work because the work is too heavy (Tr. p. 99).  The VE then testified that such a person can work as an addresser, which is sedentary, SVP 2, DOT 209.587-010, 139,000 jobs in the national economy and 2000 jobs in Louisiana (Tr. p. 100).

The VE posed a third hypothetical involving a person who can do sedentary work, who has Dauzat's education and work experience, who is illiterate, and who can understand, remember and carry out short, simple and detailed, but not complex, work-related instructions, who can respond appropriately to supervisors and coworkers, and can make simple work-related decisions (Tr. p. 100).  The VE testified that such a person can work as an addresser (Tr. p. 100).  The VE testified that the problem with the person's employability is his illiteracy (Tr. p. 100).

The VE further explained that the job of addresser does not require literacy because an addresser uses a computer-generated list of gummed labels that he sticks to envelopes (Tr. p. 101).  The VE

testified that, if the person has to elevate one leg above his heart, or at table height, there are no jobs which he can do (Tr. p. 102).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Dauzat (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Dauzat has not engaged in substantial gainful activity since September 15, 2009 (Tr. p. 15), and that he has severe impairments of anxiety disorder, mood disorder, and

23

psychotic disorders, all exacerbated by substance abuse, alcohol abuse, a personality disorder, and is status post anterior cruciate ligament tear and medial meniscus tear in the right knee (Tr. p. 15). The ALJ further found that Dauzat's impairments, including the substance abuse disorder, meet listing 12.09 by reference to Listing 12.04 of Appendix I, 20 C.F.R. Part 404, Subpart P, but that, if Dauzat stopped the substance use, his remaining limitations would still be severe impairments, but Dauzat would not have an impairment or combination of  impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 15-16).  The ALJ also found that, even if Dauzat stopped the substance abuse, he would still be unable to perform his past relevant work as a scrap worker, a construction worker, and a tire changer (Tr. p. 23).

At Step No. 5 of the sequential process, the ALJ further found that, if Dauzat stopped his substance abuse, he has the residual functional capacity to perform the full range of sedentary work except that he can only understand, remember and carry out short, simple work-related instructions that are not involved (meaning not complex or detailed), and he is able to make only short, simple work-related decisions, but he is able to respond appropriately to supervisors and co-workers (Tr. p. 18).  The ALJ found that Dauzat is a younger individual with a limited education[3] and that the transferability of

---

[3] The ALJ stated that he did not find Dauzat's claim of illiteracy to be credible because Dauzat's function report form states, and Dauzat's wife reported on the form, that Dauzat does not follow written instructions well because he has to keep "going over" them (Tr. pp. 23-24).  The ALJ found that indicated that Dauzat has the ability to read at some level (Tr. p. 24).

work skills is not material to the disability determination (Tr. pp. 23-24).   The ALJ concluded that, if Dauzat stopped his substance abuse, there are a significant number of jobs in the national economy which Dauzat can perform (as an addresser) (Tr. p. 25).   The ALJ also concluded that the substance abuse disorder is a contributing factor material to the determination of disability because Dauzat would not be disabled if he stopped the substance abuse; since the substance abuse disorder is a contributing factor material to the determination of disability, Dauzat has not been disabled within the meaning of the Social Security Act at any time through the date of the ALJ's decision on March 9, 2012 (Tr. p. 25).

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.   McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).   For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).   Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.   The substantiality of the evidence must take into account whatever in the

record fairly detracts from its weight.   <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.   <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).   The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.   <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).   Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).   The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law.   <u>Dellolio</u>, 705 F.2d at 125.   But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Emergency Ruling 96-200</u>

First, Dauzat contends the ALJ erred in refusing to apply Emergency Ruling ("EM") 96-200 and in misapplying the DAA rules. Specifically, Dauzat contends that Dauzat's ability to work and maintain his primary relationships despite his alcohol consumption casts doubt as to whether he qualifies as an addict pursuant to 42 U.S.C. 201(k).   Dauzat also contends that his testimony about a three-month abstinence period, during which his symptoms of anxiety and depression continued, meets the burden of proving the non-materiality

26

of his alcoholism to his disability.  Finally, Dauzat argues that Dr.
Stigall misunderstood the legal definition of "material" under S.S.R.
82-60, and the ALJ failed to define it for him.

1.

There are special statutes and regulations governing drug and
alcohol cases.  An individual cannot be considered to be disabled if
drug addiction or alcoholism is "material" to that consideration. 42
U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.935(a).  Social Security
Ruling ("SSR") 82-60 (1982) was the published policy interpretation
ruling with regard to the Social Security Administration's policies on
drug addiction or alcoholism ("DAA").

The Contract with America Advancement Act of 1996, Pub.L. No.
104-121, 110 Stat. 848, 852 (enacted March 29, 1996) added an extra
step to the five-step sequential evaluation for claimants with drug
addiction or alcoholism.  The Act amended the Social Security Act to
provide that "[a]n individual shall not be considered to be disabled
for purposes of this subchapter if alcoholism or drug addiction would
(but for this subparagraph) be a contributing factor material to the
Commissioner's determination that the individual is disabled." 42
U.S.C. § 423(d)(2)(C); see also McGoffin v. Barnhart, 288 F.3d 1248,
1251 (10th Cir. 2002).  The claimant bears the burden of proving that
drug or alcohol addiction is not a contributing factor material to his
or her disability.  Brown v. Apfel, 192 F.3d 492, 498-99 (5th Cir.
1999).

Questions as to SSR 82-60 policies and procedures were answered
and explained in EM-96200 (1996), which is an unpublished, internal

27

SSA document that provided guidance to SSA employees who were tasked with processing claims for benefits.  See Salazar v. Barnhart, 468 F.3d 615, 622-623 (10th Cir. 2006).

In 2013, SSR 13-20 was published and superceded both SSR 82-60 and EM-96200.  SSR 13-20 explains the process for an adjudicator to determine whether drug or alcohol abuse is a material contributing factor to a claimant's disability.

2.

First, Dauzat complains the ALJ refused to apply EM-96200, stating it was not "judicially enforceable."

Social Security Rulings are agency rulings published in the Federal Register under the authority of the Commissioner of Social Security and binding on all components of the Administration.  These rulings represent precedent final opinions and orders and statements of policy and interpretations that have been adopted by the Administration.  20 C.F.R. § 402.35(b)(1); SSR 00-4p.  Where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.  Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000), citing Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. 1981) (enforcing social security agency ruling).  However, EM-96200 was not a published ruling; it was an unpublished memo intended to assist social security employees with processing claims.  See Cage v. Commissioner of Social Security, 692 F.3d 118, 124 (2d Cir. 2012), cert. den., __U.S.__, 133 S.Ct. 2881 (2013).  See also, Connolly v. Bowen, 879 F.2d 862, **2 (4th Cir. 1989) (social security rulings

become binding when published).  Therefore, the ALJ was not bound to apply EM-96200 in Dauzat's case.

Next, Dauzat the ALJ erred in failing to determine whether Dauzat is a "qualifying addict," as defined in 42 U.S.C. 201(k), and therefore should not have made a drug addiction of alcoholism analysis in Dauzat's case.  Dauzat contend he is not a "qualifying addict" because has been able to work and maintain his primary relationships, and Dr. Stigall testified that Dauzat uses alcohol intentionally for "self-medication," rather than being controlled by it.  Section 201(k) states: "The term 'addict' means any person who habitually uses any habit-forming narcotic drugs so as to endanger the public morals, health, safety, or welfare, or who is or has been so far addicted to the use of such habit-forming narcotic drugs as to have lost the power of self-control with reference to his addiction."  Since that provision applies only to narcotic drugs which, as defined in Section 201(j), does not include alcohol, it is inapplicable to Dauzat's case, and the ALJ did not err by failing to use it.

Next, Dauzat contends the ALJ failed to consider his three-month abstinence period, during which his symptoms of anxiety and depression continued.  Dauzat contends that his work history and abstinence history meet his burden of proving that his alcoholism is nonmaterial to his disability.  However, the ALJ found that, although Dauzat would continue to have some symptoms of anxiety even if he stopped drinking, those symptoms would not be so severe as to preclude all work activity; the ALJ noted that Dauzat admitted he was able to work while he was not drinking (Tr. p. 22).  Since Dauzat worked both while he

was drinking and while he was not, substantial evidence supports the ALJ's finding that Dauzat would be able to work if he was not drinking, and that Dauzat failed to prove his alcoholism was not material to the disability determination (Tr. p. 23).

Dauzat further argues that the ALJ erred in relying on Dr. Stigall's testimony as to his residual functional capacity because it was based on an erroneous definition of "material." Dauzat contends that alcoholism or drug addiction is "material" to the disability determination if the evidence shows that impairment(s) which have been found disabling would not longer be found disabling if the individual's drug or alcohol addiction were eliminated. Dr. Stigall testified that he believes "material" in the drug or alcohol addiction context means "relevant" to the determination of whether the claimant is disabled or not (Tr. p. 93).

While Dr. Stigall's definition may be broader than the standard of whether the claimant's alcoholism or drug addiction is a contributing factor in the determination that the individual is disabled, Dr. Stigall appears to have applied the correct standard in his assessment. Dr. Stigall stated that bipolar disorder or mood disorder can produce problems responding to work pressures and supervision, and in interacting with coworkers, and that substance abuse can produce problems dealing with work pressures, concentration, and socializing with the public (Tr. pp. 94-95). Essentially, Dr. Stigall testified that Dauzat's substance abuse enhances or increases the functionally limiting effects of his bipolar disorder and his mood

disorder; thus the effects of the two could not be separated.[4] However, as the ALJ pointed out, Dr. Stigall further testified that Dauzat would be able to work if he was sober, and specified what his residual functional capacity would be without the detrimental effects of substance abuse (Tr. pp. 93-94). Therefore, regardless of how Dr. Stigall framed the definition of "material," the correct standard was applied to Dauzat's disability determination.

Substantial evidence supports the Commissioner's findings as to Dauzat's residual functional capacity, both with and without the effects of his substance abuse disorder and his finding that Dauzat would be able to work if he stopped drinking. This issue is meritless.

Issue 2 - Credibility

Next, Dauzat contends the ALJ's credibility assessment was improper. Dauzat argues the ALJ incorrectly discredited his complaints of knee pain and its limiting effects on his ability to stand and walk.

Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged. The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence. Harper v. Sullivan, 887 F.2d 92,

---

[4] It is noted that Dr. Alla diagnosed Dauzat with a "mood and anxiety disorder with alcohol abuse/dependence and alcohol abuse" in 2010 (Tr. p. 324).

96 (5th Cir. 1989), citing <u>Owens v. Heckler</u>, 770 F.2d 1276, 1281 (5th Cir. 1985).  The mere existence of pain is not an automatic ground for obtaining disability benefits.  The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if supported by substantial evidence.  <u>Fortenberry v. Harris</u>, 612 F.2d 947, 950 (5th Cir. 1980).

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §404.1529(c)(4).  Subjective complaints of pain must be corroborated by objective medical evidence.  <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2000).  Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting and wholly unresponsive to therapeutic treatment.  <u>Chambliss</u>, 269 F.3d at 522.

While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.  <u>Elzy v. Railroad Retirement Bd.</u>, 782 F.2d 1223, 1225 (5th Cir. 1986); <u>Loya v. Heckler</u>, 707 F.2d 211, 215 (5th Cir. 1983).  The ALJ's decision on the severity of pain is entitled to considerable judicial deference.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 128-29 (5th Cir. 1991); <u>Jones v. Bowen</u>, 829

F.2d 524, 527 (5th Cir. 1987); <u>James v. Bowen</u>, 793 F.2d 702, 706 (5th Cir. 1986).  Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints.  <u>Falco v. Shalala</u>, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to Dauzat's pain and credibility (Tr. pp. 19-20):

"The claimant alleges disability as of September 15, 2009, and he has received fairly regular treatment for knee pain since that time.
         *          *          *
"[In January 2011,] Dr. Saleem opined that the claimant should be able to sit, stand, push and pull, kneel, crawl, crouch, reach, grasp, handle and finger objects.  He went on to find that the claimant has no need for an assistive device. (Exhibit 4F.)

"On February 10, 2011, James Williams, M.D., a state agency medical consultant, reviewed the evidence in this case and opined that the claimant is able to perform the exertional demands of medium work.
         *          *          *
"New evidence generated since Dr. Saleem's examination and Dr. Williams' review of the file suggest that the claimant may be more limited than suggested by those physicians.
         *          *          *
"Though the claimant likely does have some knee pain, the evidence does not show his pain to be so severe as to preclude sedentary work, as that work requires only about two hours of standing and walking and six hours in a [sic] sitting during a workday.
         *          *          *
"As discussed above, the claimant testified that he is able to walk only about five or ten minutes, and he identified very few daily activities, stating that he does not cook, shop for groceries, or do household chores.  The medical evidence, however, does not support a finding that the claimant would be unable to perform the exertional demands of sedentary work.

"Giving the claimant maximum benefit of the doubt, the undersigned finds the claimant retains the physical residual functional capacity for sedentary work... .  In reaching this conclusion, the undersigned relies on the objective abnormalities confirmed by the MRI in February 2011 as well

> as the claimant's partially credible complaints. The claimant's subjective report that he is able to walk only about five or ten minutes is not accepted, as it is inconsistent with the clinical findings of full range of motion and near-normal strength."

Since the ALJ in this case has made the mandatory indication of the basis for his credibility choices concerning claimant's complaints, and since his choices are not unreasonable, his finding that Dauzat's pain would not prevent Dauzat from performing sedentary work is proper. <u>Carry v. Heckler</u>, 750 F.2d 479, 485-86 (5th Cir. 1985). Although the tear in Dauzat's meniscus may be irreparable, that does not mean he suffers from pain that is constant, unremitting and wholly unresponsive to therapeutic treatment. Substantial evidence supports the Commissioner's conclusion that Dauzat is not disabled by pain.[5]

This issue is meritless.

<u>Issue 3 - Medical Evidence</u>

Dauzat contends the ALJ did not comply with 20 C.F.R. § 404.1527 in weighing the evidence because he failed to weigh the opinion of Tom Ray, Ph.D., that Dauzat is unable to maintain social functioning. Dauzat suggests that Tom Ray's opinion is entitled to greater weight than that of Fay Thrasher, Ph.D.

Tom Ray was a State Disability Determination Services examiner

---

[5] Dauzat also contends the ALJ used the incorrect standard that, if he stopped drinking, his mental complaints must preclude "all work activity" (Tr. p. 22). Of course, all work activity must be precluded by all of Dauzat's other impairments (excluding alcohol abuse), not just his mental impairments. Although the ALJ apparently mis-stated the burden of proof in that single sentence, his hypothetical to the VE correctly included all of Dauzat's impairments aside from alcohol abuse, and he applied the correct standard to Dauzat's case.

who, in February 2011, reviewed Dauzat's medical records and formed an opinion based on those records, including the medical records from Fay Thrasher, Ph.D. (Tr. pp. 119-122).  While Tom Ray's report is not in the administrative record, a summary of his findings is included in a case analysis and explanation by a disability adjudicator (Tr. pp. 117-126).  That report indicates that Tom Ray found Dauzat has a moderate limitation in maintaining social functioning (Tr. p. 121), which Dauzat contends the ALJ failed to consider.  However, Dr. Stigall also found Dauzat has a moderate limitation in maintaining social functioning (Tr. p. 82) and the ALJ relied on Dr. Stigall's assessments in determining Dauzat's residual functional capacity. Therefore, the ALJ considered the finding that Dauzat has a moderate limitation in social functioning.

This issue is meritless.

Issue 4 - Vocational Expert

Finally, Dauzat contends that competent evidence does not support the ALJ's reliance on the vocational expert's testimony because the addresser job identified by the VE does not exist in significant numbers and because the job of addresser requires the ability to read.

The Social Security Act, 42 U.S.C. §423(d)(2)(A) provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several other regions of the country.  It does not matter whether - (1) work exists in the immediate area in which you live; (2) a specific job vacancy exists for you; or (3) you would be hired if you applied for work."  Section 404.1566(b) further states:

"Work exists in the national economy when there is a
significant number of jobs (in one or more occupations)
having requirements which you are able to meet with your
physical or mental abilities and vocational qualifications.
Isolated jobs that exist only in very limited numbers in
relatively few locations outside of the region where you
live are not considered 'work which exists in the national
economy.'"

Dauzat points out that the VE relied on SOC[6] 43-9022 (Tr. p. 101)
for the number of jobs in Louisiana (2000). However, the SOC
specifies that category 43-9022 includes eight different jobs under
the DOT.[7] Therefore, the 2000 jobs existing in Louisiana are not all
addresser jobs.

Dauzat contends that, according to another job market source, Job
Browser Pro, there are 51 addresser jobs in Louisiana. The Respondent
argues that since the VE testified there are 139,000 jobs in the
national economy, the job exists in significant numbers. However,
that number suffers from the same problem as the number of jobs in
Louisiana; it is divided among eight different jobs. Again, the
record does not show how many addresser jobs there are in the nation.
Moreover, if the job only exists nationally and not regionally, the
Commissioner must show that the job does not exist only in very
limited numbers and in relatively few locations outside of Louisiana.

Since the numbers of addresser jobs in either the regional

_____

[6] The Standard Occupational Classification system is used by
federal statistical agencies to classify workers into occupation
categories for the purpose of collecting, calculating, or
disseminating data. United States Department of Labor, Bureau of
Labor Statistics, Standard Occupational Classification, *at*
http://www.bls.gov/soc/.

[7] Dictionary of Occupational Titles.

(state) or the national economies are not in evidence, substantial evidence does not support the finding that there is a significant number of jobs that Dauzat can perform if he abstains from drinking. Dauzat's case should be remanded to the Commissioner for a more accurate determination of how many addresser jobs there are in Louisiana, how many jobs and their locations in the nation, to determine whether there are a significant number of addresser jobs.

Dauzat also contends that the VE's testimony that an illiterate person can work as an addresser conflicts with the DOT job description, which requires Level 2 reading skills.

The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.  A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specified job.  Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986), and cases cited therein.  Also Vaughan v. Shalala, 58 F.3d 129 (5th Cir. 1995).  However, in the case of a direct conflict between the vocational expert's characterization of the exertional level or skills required to perform a particular job and the Dictionary's (DOT) statement of the necessary requirements for the job, a remand may be required to further explore the issue.  Eaves v. Apfel, 1147 F.3d 240, *1-*2 (5th Cir. 2001), citing Carey v. Apfel, 230 F.3d 131 (5th Cir.2000).

In the case at bar, the VE testified that an illiterate person can do the job of addresser because that person simply peels and

sticks address labels to envelopes.   Dauzat relies on the definition of "addresser" in the Dictionary of Occupational Titles, which states that an addresser must have Level 2 reading skills.[8]   The undersigned notes that the description of an "addresser" in the Dictionary of Occupational Titles (1991) appears to be very outdated:

> "Addresses by hand or typewriter, envelopes, cards, advertising, literature, packages, and similar items for mailing.  May sort mail."

DOT 209.587-010, 1991 wl 671797.   It is common knowledge that handwriting and typewriters are no longer used in mass mail and that, since 1991, pre-printed peel and stick labels have been used. However, there is some question as to whether peel and stick labels are still commonly used, or whether mass mail is now more commonly addressed by a computer and printer from a mailing list.

The Respondent argues that the ALJ rejected Dauzat's claim that he is illiterate, finding that Dauzat had completed the sixth grade and that the disability forms his wife filled out for him show that he "does not follow written instructions well" because he has to "keep going over it" (Tr. pp. 23-24).   The ALJ found this answer implied that Dauzat has "the ability to read at some level" (Tr. p. 24). However, the evidence does not show what that level is, or whether it is adequate to do the job of addresser as described in the DOT or as it is actually performed in today's economy.[9]   It is also noted that

---

[8] The ALJ did not ask the VE whether his analysis conflicted with the DOT, which is a failure to comply with SSR 00-4p.

[9] The DOT description of addresser requires Level 2 Language Development, which is:
Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure

the ALJ did not question Dauzat (or his wife) as to who filled out his social security forms, and whether he took special education or regular classes in school.

Since there is a direct conflict between the VE and the DOT with respect to the literacy requirement for the job of addresser, substantial evidence does not support the Commissioner's decision that Dauzat is not disabled.  Therefore, this case should be remanded to the Commissioner clarify Dauzat's actual reading level and the reading requirements of the job of addresser, as well as to determine whether there are actually a significant number of addresser jobs existing in Louisiana.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Dauzat's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy

---

stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjective and adverbs.
DOT, Appendix C-Components of the Definition Trailer, 1991 wl 688702 (1991).

thereof.   No other briefs   (such as   supplemental objections, reply briefs etc.) may be filed.   Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.   Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 26th day of June 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE